McGowan, Appellant, vs. Paul and others, Respondents.

*October 8, 1909—February 1, 1910.*

*Towns: Powers: Sidewalks and street lighting: Contracts: Tax levy:*
*Restraining unauthorized expenditure: Taxpayer's action.*

1. A town has no power to raise money by general taxation to build
   sidewalks and light public streets in an unincorporated village
   within its boundaries.
2. One taxpayer may maintain an action in behalf of all taxpayers
   even though, by reason of an estoppel, he has for himself alone
   no equitable ground of complaint.
3. The expenditure of moneys raised by a tax levy upon property
   generally in a town for the unauthorized purpose of building
   sidewalks and lighting streets, pursuant to contracts thereto-
   fore made, in an unincorporated village within the town, will
   be restrained in an action brought by one taxpayer in behalf of
   all, even though all except the plaintiff have indicated their
   consent to the levy by voluntarily paying the tax pending the
   suit. The doctrine of equitable estoppel is inapplicable to such
   a case because the town had no power whatever to make the
   contracts or levy the tax complained of. *Babcock v. Fond du*
   *Lac,* 58 Wis. 230, distinguished. MARSHALL, J., doubts.

APPEAL from a judgment of the circuit court for Rock
county: GEORGE GRIMM, Circuit Judge. *Reversed.*

Taxpayer's action to restrain the officers of a town, in which
is located an unincorporated village, from carrying out a side-
walk and a street-lighting contract.

These facts were established, as stated in the trial court's
decision, in addition to such as appertain to the capacity of
plaintiff to maintain the suit and of defendants to be parties:
The town of Milton, in Rock county, contains the unincorpo-
rated village of Milton Junction. Such village is a railroad
center, and the condition of things is such as to render side-
walks, as contemplated by the sidewalk contract, and street
lights, as contemplated by the contract on that subject, rea-
sonably necessary for the safety of pedestrians using the pub-
lic ways. April 5, 1904, at the annual town meeting, a reso-

lution was adopted by the electors in favor of putting in good cement sidewalks on streets where abutting property owners were willing to pay one half,the expensé, and to levy a tax therefor not to exceed $1,000 in any one year.   At the annual town meeting of 1905, the amount was reduced to $800. At the annual town meeting of 1907, a further attempt to re-·duce the amount failed.ˊ  Taxes were accordingly levied for 1904, 1905, and 1906 and collected for the special purpose of ·defraying the expense of sidewalks.   April 2, 1907, there was in the special fund $275.46.   It had been customary for several years to maintain street lights in the village at public expense, money being raised by taxation for that purpose with-·out objection by any one.   For such purpose, at the annual town meeting in 1907, $179 was voted.   Also $200 was voted to be used to purchase a stone crusher.   Thereafter defendants, officers of the town, as such, contracted with B. P. Cross-·man to build cement sidewalks, where designated by them, at a stipulated price, one half to be paid by the town and one half by the owners of abutting property, the walks to be built where such owners were willing to be so burdened.   Crossman was carrying out such contract when this action was commenced. There was then due him $385.45.   April 2, 1907, said officers, as such, contracted with Harry Hayes and ·William Doran for street lighting, which contract was also being carried out when this action was commenced.   After such commencement, it being claimed that the tax levy for the special purposes had not been properly made for 1907, due proceedings were had at a special meeting to that end, and for the expenditure of the balance of $279 left over as aforesaid; also for raising $200 for the construction of crosswalks.   At the same time, the transactions of officers for 1907 as to such matters, up to the date of the meeting, were approved.   Plaintiff had knowledge of the methods pursued by the town, as aforesaid, from year to year, and the making of the sidewalk contract and doing the work and furnishing the material there-

under, and not only made no objection during the time the expenses were being incurred, but participated therein by furnishing oil for street lamps and obtaining from the town pay therefor. The taxes voted for 1907, as aforesaid, were levied and raised after this action was commenced, all taxpayers paying voluntarily, except plaintiff, who paid his tax under protest, amounting to $3 for sidewalks and less than $1 for street lamps. He filed a claim against the town for a return thereof. The action was commenced because of personal differences between him and the town officers. All transactions in respect to the contracts were had in good faith, and were within the discretion vested in town officers by action of the electors at the town meeting. Judgment was awarded dismissing the complaint with costs.

*L. E. Gettle,* for the appellant.

For the respondents there was a brief by *Jeffris, Mouat, Smith & Avery* and *John Cunningham,* and oral argument by *Mr. M. O. Mouat* and *Mr. Cunningham.*

The following opinion was filed November 12, 1909:

PER CURIAM. The trial court seems to have supposed it was competent for a town to, by general taxation, pay for building side and cross walks and lighting public streets in an unincorporated village within its boundaries. Counsel for respondent now so maintain, supporting that view by referring to the general authority of towns as to bridges and highways and making contracts to effectuate their corporate powers.

The general scheme of town government is to divide the territory into districts and, in the main, put the burden of maintaining highways in each upon the taxable property therein. In view of that, pretty plain language would be required in a statute to effectively show a legislative intent to burden the property of a town, generally, as claimed by respondent's counsel.

As an original matter, it would seem quite unreasonable to do such work as that in question at the expense of taxpayers of a town, generally, necessarily including many persons not benefited at all by the expenditure. Therefore, power to do so cannot be implied from general language respecting the subject of highways, which in the executory features does not so contemplate.

That the legislature did not purpose creating any such power as that contended for, is quite plainly indicated by the fact that it adopted a complete system in relation to the subject, by resorting solely to local taxation for the particular local purpose, in harmony with the general scheme of town government. Such system is found in secs. 1243, 1346a, 1346b, and 819, Stats. (1898). In so industriously providing for such local matters, it is the opinion of the court that it was intended to make the plan exclusive.

There being no legislative authority for the taxes, or the expenditure of money raised by general taxation, for the purposes in question, it follows that the contracts, the validity of which was challenged, were void, and the levy, impending when the action was commenced and thereafter made, was without legal authority.

Thus the basic reason upon which the learned circuit court's decision is grounded is fallacious. It is thought that, had the court not supposed the town possessed the power which it attempted to exercise, and that the difficulty lay in mere irregular, or, at most, jurisdictionally defective, execution of the power, the conclusion would not have been reached that appellant's complaint was without equity.

True, the situation confronting the taxpayers of the town at the time the action was commenced was one they had submitted and been parties to for three years, and, for aught that appears, all, except the one who invoked judicial aid in behalf of all, to put a stop to the practice, were willing to have it continue. There is some reason to claim, from the general

payment of the taxes pending the litigation, that they thereby repudiated the attempt, in their behalf, to prevent an accumulation and expenditure of funds as before.

Under the peculiar circumstances stated, had general taxpayers any standing in a court of equity, when this action was commenced, to obtain the relief sought, or, if they had, did they not supersede it by paying the taxes pending the action?

It would not militate against maintenance of the action that the actor in commencing the litigation did not have an equitable ground for complaint, for himself alone, if such were the fact, since he was of the general class who were pecuniarily interested in conserving the public funds. *Cawker v. Milwaukee,* 133 Wis. 35, 113 N. W. 417. That is upon the theory that, while an individual taxpayer may be estopped by his conduct from successfully appealing to equity jurisdiction for relief against a threatened unlawful levy of taxes, or one imposed, or a threatened illegal expenditure of public funds, he is not, when acting for all taxpayers, since all may not be affected by the equitable estoppel.

Now it may be conceded, for the purposes of the case, that, when the contracts were made and the contractors commenced incurring expense under the same, and the levy of the tax to pay therefor was only impending, all taxpayers, including the one who later became active in hostility thereto, must have known of the facts; and that no person raised his voice in opposition, but the particular one, and that all, except such particular one, indicated consent in the matter after the litigation commenced, so far as payment of the taxes and keeping silent would so indicate. Nevertheless, had the taxpayers, when the action was commenced and thereafter, the right to equitable interference to stop the levy of the tax or expenditure of the proceeds of the levy?

In dealing with the subject in hand, the court must give significance to the fact that the difficulty with the situation, complained of, was not in there being a mere irregular execution

of a power, after jurisdiction obtained in that regard, leaving only mere details to be worked out, as to which there was failure so great as to be fatal to the levy, if it were seasonably challenged, but not otherwise, as in *State ex rel. Schintgen v. La Crosse,* 101 Wis. 208, 77 N. W. 167.

The doctrine of that case, so confidently relied on by respondent's counsel, and probably by the court below, does not apply if it is to be restricted to such situations as were there dealt with. In that instance, there was power and jurisdiction obtained to execute it, but failure to observe the statutory regulations as to details, and performance of the work with knowledge of the plaintiff, he being benefited thereby.

In *Jorgenson v. Superior,* 111 Wis. 561, 87 N. W. 565, the court refused to apply the doctrine of estoppel, as in the *Schintgen Case,* because, though there was municipal power, the jurisdictional steps requisite to its effective activity were not taken. Referring to the *Schintgen Case* the court said:

Such cases "are all or nearly all based upon the fact that the municipality doing the act had jurisdiction to do the act done, and was acting within the limits thereof, although informally. When the act done is without jurisdiction or authority, few if any of the cases recognize or enforce an estoppel."

Adding, as to the case in hand: "In this case the act of the city was wholly without authority." Elements of estoppel there existed quite as significantly as in the present instance.

*Babcock v. Fond du Lac,* 58 Wis. 230, 16 N. W. 625, has attracted attention, as having some similarity to this case, and as leaning to the side of respondent. It was a taxpayer's action to prevent payment of money, raised by taxation, voluntarily contributed by all taxpayers, on a contract upon the ground that the indebtedness created thereby was beyond the constitutional limitation, and hence the contract and the levy were absolutely void. The action was not commenced till after the fund to discharge the contract had been accumulated

by the voluntary payments.    The defendant prevailed upon the ground that, all taxpayers having voluntarily paid their taxes, no one had any equitable or legal ground for preventing the fund from being used for the purpose it was raised, regardless of the void character of the contract and the tax.

It is the opinion of the court that the *Babcock Case* is widely distinguishable from this one, in that the purpose of the contract was within the municipal power.    Authority to use the power, in the manner attempted, was dormant because of the constitutional limitation upon municipal indebtedness. Ample power to levy a tax, for the purpose of defraying the expense of the things contemplated by the contract, existed. Had taxes been levied and money accumulated in anticipation of a future liability in that regard, they would have been free from infirmity.    So the case is in harmony with *Jorgenson v. Superior, supra.*

Here there was no power to levy the tax or make the contracts complained of.    The difficulty was greater than a jurisdictionally defective execution, as to details, of an existing power, after having obtained jurisdiction to use the power, as in the *Jorgenson Case,* or, than want of jurisdiction at all to use an existing power, as in the *Babcock Case.*    There is no basis whatever for the practice sought to be restrained.    The infirmity was so great as to render all the proceedings clear usurpations.    So under the rule of the *Jorgenson Case* there was nothing in the conduct of the taxpayers militating against their interfering, to effect, with execution of the void contracts, at least so long as the fund depended on was under public control, as was held in somewhat similar circumstances in *Frederick v. Douglas Co.* 96 Wis. 411, 71 N. W. 798.

It seems well to notice the claim that a court of equity should not, in any case, interpose to prevent the imposition of a threatened levy of taxes and prevent incurring indebtedness on the faith of such levy, citing *Judd v. Fox Lake,* 28 Wis. 583; *Sage v. Fifield,* 68 Wis. 546, 32 N. W. 629; and *Harley v. Lindemann,* 129 Wis. 514, 109 N. W. 570.

Whether all said in such cases is entirely consistent with *Peck v. School Dist.* 21 Wis. 516; *Bay L. & I. Co. v. Washburn,* 79 Wis. 423, 48 N. W. 492; *Cawker v. Milwaukee,* 133 Wis. 35, 113 N. W. 417, and similar cases, we need not stop now to discuss. It is sufficient to say that in case of one of the purposes of the action, as here, being to prevent, on the ground of illegality, incurring indebtedness or disbursing of public funds for an illegal purpose, the doctrine of *Peck v. School Dist., supra,* as to competency of a court of equity to interfere at the suit of a taxpayer, has been uniformly sustained. In *Judd v. Fox Lake, supra,* which was followed in *Sage v. Fifield, supra,* and *Harley v. Lindemann, supra,* the distinction was pointed out between mere threats by public officers to do acts, which if done would be injurious to taxpayers, and acts already done, such as the making of an illegal contract in contemplation of collecting taxes or of disbursing moneys on hand in execution of it. This case belongs to the latter class.

The judgment is reversed, and the cause remanded with directions to render judgment declaring the contracts void and the levy of taxes and collection of the same for the purposes contemplated by such contracts illegal, and enjoining the town officers from issuing orders upon the town treasury for payment of any money upon such contracts, and enjoining the disbursement upon such contracts of any money in the town treasury collected by general taxation.

The following opinion was filed November 18, 1909:

MARSHALL, J. (*doubting*). That the decision of the court is right, if it is right in all cases to follow technically applied principles as fenced about by the facts of precedents, I concede. I do not doubt but that the court has heretofore not gone further in the application of the doctrine of equitable estoppel, than is indicated in the opinion; but can it not go further? Can it not go as far as the boundaries of the prin-

·ciple itself, which has always and should always distinguish the administration of justice; thus demonstrating, as far as practicable, that the end sought in judicial administration, above all things, is to give the broadest and most efficient effect possible to those principles of justice, evolved through the wisdom of ages, rather than stop at mere precedents which, applied arbitrarily, as if they, instead of the principles upon which they are grounded, should govern; give to the application the cast of mere technicality.   The answer to that, seemingly, has often been authoritatively given by this court in words to the effect that, principles antedate and are paramount to precedents.   The latter merely follow the former; do not ·control them; the controlling force is in the former.   Given ·a state of facts within the principle, suggesting that the attainment of justice requires a new application, then the court ·should not stop before reaching the legitimate goal, for want of a precedent, but a new one should be made, thus illustrating the crowning dignity of the law as a science; the fundamental principles of justice.

As we said, by sanction of the court on another occasion, giving point thereto by judicial action creating a most important precedent:

"There is no vitality in precedents; there is in rules. They ·are susceptible of expansion along every line necessary to reach new conditions.   In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm.   Precedents will be a constant guide, but never a bar.   Where a new ·condition exists, and legal remedies are inadequate or none are afforded at all, the never-failing capacity of equity to adapt itself to all situations will be found equal to the case, ·extending old principles, if necessary, not adopting new ones, for that purpose."   *Harrigan v. Gilchrist,* 121 Wis. 127, 235, 99 N. W. 909, 936.

A failure, perhaps, to give to the doctrine stated its proper ·dignity and activity, renders the judicial development of the

law, in some fields, so slow as to impress the people that it has stopped altogether unregardful of the fact that the everchanging conditions of society render such development reasonably necessary in order to render our common-law adaptable to the new situations, resulting in such impatience and revolt as to stimulate, to effect, legislative coercion, sometimes possibly beyond constitutional limitations, and often in such disturbance of judicial inertia as to result in confusion and uncertainty, requiring much time and energy to render again plain the legal pathway for bench and bar.

In this case the learned circuit court, doubtless, thought to grasp and appreciate the principles ruling the cases cited in the court's opinion, and, with the true dignity of the chancellor, to apply them to the facts in hand, without hesitation, merely because the result might be a new precedent.

Such exhibitions of judicial learning and courage give to trial courts distinction, instead of furnishing ground for severe, if any, criticism.

Did not the learned circuit court judge rightly in respect to the basic thought in *State ex rel. Schintgen v. La Crosse,* 101 Wis. 208, 77 N. E. 167 ? Is not such thought this: If a person keeps silent in respect to a thing which is being done by another, in good faith relying upon its being by legitimate public authority, such person having knowledge of the facts, and by his attitude giving such other reasonable ground to suppose that if he had legal ground to object he would do so, and not doing so he has none, or if he has any he chooses to waive it, and so relying, such a condition is created that, if such person were allowed to change his position and successfully insist upon his legal rights it would be to his gain and such other's loss, equity will not aid him to secure such advantage; one of the plainest, most commonly applied principles of equitable estoppel; one which, stated abstractly, is that, he who keeps silent when he ought to speak shall not be heard by the ear of equity if, after so keeping silent, he does

speak.   If I rightly read *State ex rel. Schintgen v. La Crosse, supra,* such is the case.   The court there declared, in about so many words, that it merely applied the ordinary doctrine of estoppel and that such doctrine was applicable because the facts were within the principle of it.   True, there was power to do the act and jurisdiction obtained to exercise the power and merely jurisdictional infirmity as to details in such exercise, as said in the court's opinion, but the fact of there being the preliminary power and legitimate initiative was not stated as a ground of the decision, they being treated as mere circumstances, among others, complete in themselves, calling for use of the estoppel.   The cases cited to support the opinion, if I read them rightly, show that the mere fact that the particular thing attempted might have been done in an effective way, was not the turning point, but fatal laches was and nothing else. That is most significantly illustrated by *Penn Mut. L. Ins. Co. v. Austin,* 168 U. S. 685, 18 Sup. Ct. 223.   Here is the gist of the matter, stated in the language of Mr. Justice WHITE:

"The reason upon which the rule is based is . . . where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect. . . . The requirement of diligence, and the loss of the right to invoke the arm of a court of equity in a case of laches, is particularly applicable where the subject matter of the controversy is a public work."

Now, though the court refused to apply the doctrine of the *Schintgen Case,* when it came to *Jorgenson v. Superior,* 111 Wis. 561, 87 N. W. 565, it was in my judgment for the very poor reason that the cases were unlike in their facts, in that jurisdictional initiative existed in the former but not in the latter.   All the elements of an equitable estoppel, according to the logic of the *Schintgen Case* and that of the federal case,

·existed in the latter instance, and do here, as significantly as in the first. The court merely ran the course of the precedents, as was supposed, and refused to go further, though it seems the facts appealed as strongly to the forum of conscience in the one case as in the other.

In *Babcock v. Fond du Lac*, 58 Wis. 230, 16 N. W. 625, was not the real principle applied the same as we suggest ruled *State ex rel. Schintgen v. La Crosse, supra,* and the still more moderate doctrine of mere acquiescence? The fact that there was municipal power to do the thing sought to be done, under proper conditions, but that power to do so by the creation of ·an indebtedness was dormant, as stated in the opinion, was not suggested. Can it be wrong to assert that the real mainspring ·of the decision was that there had been universal acquiescence in the levy and payment of the tax with knowledge of the facts, and silence as to the contract during the progress of the work under it, with like knowledge, and on those accounts and ·those only, that no taxpayer could successfully sue at law to ·recover back his contribution, or in equity to interfere with the use of the fund for the purpose for which it was accumulated by the voluntary payments, although the contract and all the proceedings, resulting in the fund being in the treasury, were ·absolutely void.

It was said in the *Babcock Case* that the fund having been, by universal acquiescence, accumulated for a particular purpose, there was no equitable consideration why the court should interfere to prevent the money being used therefor; that it having been so contributed for a particular purpose, it could not be used for any other, and judicial interference ·could not be of any possible benefit to taxpayers, since the voluntary payments could not be by such means restored. ·"Such interposition," said the court, "would not give restitution, nor prevent any injury, nor secure any right, nor redress any wrong. It would merely prevent a benefit to another at ·the instance of one who has voluntarily precluded himself

from all interest and benefit in the sum sought to be con-trolled."

To fully appreciate the *Babcock Case* it must be understood that it was a taxpayer's action, the same as this, and there was no legitimate basis whatever for the tax. The case went wholly on the broad doctrine of equitable estoppel. That this case is within the principle of it I may safely assert. That the principle should be applied and a new precedent be made,. if necessary, rather than relief be denied because such prin-ciple has not been heretofore extended to such precise condi-tions, may well be insisted on. Such extension of it by the learned circuit court, as occurred, seems most logical.

A motion for a rehearing was denied February 1, 1910.